**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-00994-CMA-NRN

RWT GROWTH INCORPORATED, a Canadian corporation,

     Plaintiff,

v.

REV ENERGY SERVICES, LLC, a Colorado company,

     Defendant.

---

**DEFENDANT REV ENERGY SERVICES, LLC'S MOTION FOR SUMMARY
JUDGMENT**

---

Defendant REV Energy Services, LLC ("REV Energy"), through its undersigned counsel, hereby submits its Motion for Summary Judgment on each of Plaintiff RWT Growth Incorporated's ("Plaintiff" or "RWT") claims, and states the following in support:[1]

## **INTRODUCTION**

This dispute stems from Plaintiff's strained, incorrect interpretation of the "Success Fee" provision in the parties' Advisory Agreement in an after-the-fact attempt to leverage payment out of REV Energy, when none is due and owing under the terms of the Advisory Agreement, based on financing that never was even close to closing. Plaintiff argues that the Success Fee provision should require REV Energy to pay $330,000, equal to 2% of a debt financing package offered to REV Energy but which it never accepted, plus another $330,000 as a penalty, asserting that REV Energy breached the Advisory Agreement by not paying the fee. The undisputed material facts demonstrate Plaintiff is wrong. The Success Fee provision mandated that REV Energy first *receive* "a gross funding amount" from a lender, which indisputably never occurred.

Instead, ignoring the clear language of the Success Fee provision and its ordinary and plain meaning, and the evidentiary record regarding the Parties' intent in negotiating it (including RWT's own emails at the time reflecting that the 2% Success Fee would be paid "on funding of the transaction"), RWT now concocts a contorted interpretation of the Success Fee provision's language relating to the timing of when a success fee would be transferred, if due at all, to argue that funding was "made available" to REV Energy as of January 18, 2022 -- a point in the approximate middle of

---

[1] Per D.C.COLO.LCivR 7.1(a), counsel for the Parties conferred about this Motion, including by telephone and by e-mail. Plaintiff opposes the relief requested herein.

the lifecycle of the potential financing -- when the lender's internal committee had

approved certain terms and conditions. RWT argues that, as of that date, the funds

were "available" to REV Energy, which simply needed to "draw" on them. Again, RWT's

argument has no basis in reality. As demonstrated by testimony and documents, (a) no

funding was "made available" to REV Energy as of January 18, 2022, or at any other

point in time, (b) REV Energy never fully approved all offered terms and conditions, and

(c) numerous required "Conditions Precedent to Closing" set forth in the potential

financing's term sheet were never satisfied, including completion of diligence and legal

review and preparation of definitive transaction documents, among others.

RWT prepared and signed an Advisory Agreement which contains clear and

unambiguous language about payment of the Success Fee upon receipt of funding,

which occurs only at a successful closing. It is undisputed that the potential financing

never closed, and REV Energy never received any funding from the lender. Indeed, the

lender agrees. Instead, as is common in brokerage relationships and agreements

relating to potential financing, RWT took on the risk that the potential financing might not

close and it might not be paid a commission. Instead of accepting that risk, as

contemplated by the non-binding nature of the Advisory Agreement and term sheet,

when the transaction did not proceed RWT launched a federal court lawsuit claiming

that REV Energy breached the Advisory Agreement and demanding $660,000. That is

akin to a real estate broker suing its client, a potential home purchaser, for a

commission after the client did not choose to buy the house -- to require the client to

pay the broker a commission on a home he never purchased would be an illogical and

unfair result.

REV Energy respectfully is entitled to summary judgment as a matter of law dismissing each of Plaintiff's three claims for (1) Breach of the Advisory Agreement by not paying the Success Fee (and separately, by allegedly using an asset valuation prepared for the lender with other customers, which did not occur and about which there is no genuine dispute of fact), (2) Quantum Meruit/Unjust Enrichment, and (3) Promissory Estoppel.  Each of these claims are resolved as a matter of law in REV Energy's favor by a straightforward interpretation by the Court of the "receipt of gross funding" and "made available" language of the Success Fee provision of the Advisory Agreement, and application of the undisputed materials facts in this case to that interpretation, which demonstrate that no Success Fee was due when the transaction failed mid-stream, REV Energy never received funding, and where potential funding was not "made available" to REV Energy.  Respectfully, this Motion should be granted.

## STATEMENT OF UNDISPUTED FACTS ("SOUF")

1.      In 2021, REV Energy sought potential financing from various lending sources to help fund and further grow its fracing assets. Declaration of David Potter ("Potter Decl."), ¶ 5, attached as **Exhibit A**. REV Energy's Chief Financial Officer David Potter was introduced to RWT and its partner Andrew Ardell for assistance in brokering introductions to lenders who could offer satisfactory financing. Potter Decl., ¶ 6.

2.      Mr. Potter and Mr. Ardell negotiated an Advisory Agreement for RWT to introduce REV Energy to multiple funding sources in connection with REV Energy obtaining potential financing that met REV Energy's desires. *See* Potter Decl. ¶¶ 10-17.

3.      Mr. Ardell for RWT stated on September 9, 2021, that it would need "a 2% success fee on funding of the transaction." Potter Decl., ¶ 14, and Ex. 1 to Potter Decl.

4.      Prior to executing an Advisory Agreement with RWT, REV Energy made it clear to RWT, in mutiple communications including phone conversations and emails, that REV Energy would not pay a Success Fee to RWT unless there was a closed transaction, and REV received funds from a lender. *See* Potter Decl., ¶¶ 13-14. Mr. Potter stated REV Energy would need "the assurance that no fees will be charged to REV until funding of a deal is received." *Id.* ¶ 15; Ex. 1, to Potter Decl.  RWT acknowledges that REV Energy did so.  Ex. 8 (RWT Depo., at 120:24-121:7).

5.      Mr. Ardell responded that RWT would prepare and send an Advisory Agreement for signing, and did so, and Mr. Potter responded that those terms were agreeable. Ex. 1. Mr. Ardell never responded that RWT would not provide the requested assurance to REV Energy, or that payment would be due at any other point other than when "funding of a potential transaction was received."  Potter Decl., at ¶ 16; Ex. 1.

6.      The Advisory Agreement was fully signed on November 9, 2021, with an effective date of September 14, 2021 (the "Advisory Agreement").  Ex. 2 to Potter Decl.

7.      The Success Fee Provision, at Ex. 2, Section 3(a), states: "REV Energy shall compensate RWT as per the following:  a) Success Fee

*RWT* shall be paid a success fee equivalent to *Two Perecent* [sic] *(2%)* of the gross funding amount that *REV ENERGY*, receives as a result of the work performed by *RWT*.

The funds shall be electronically transmitted to RWT at the time at which funds are received and/or made available to REV Energy from qualified lender(s)."

8.      REV Energy did not agree to pay a Success Fee at any point short of REV Energy receiving a gross funding amount from the lender upon a closed transaction. Potter Decl., at ¶¶ 13-16, 38.

9.      RWT introduced one lender to REV Energy, Great Rock, with whom REV Energy negotiated potential terms and conditions of a financial debt facility. Potter Decl., ¶¶ 22-40.

10.     A non-binding term sheet was signed on November 3, 2021 (the "Term Sheet") to allow due diligence to proceed and further terms to be negotiated, and REV Energy paid a $75,000 good faith deposit.  Potter Decl. ¶¶ 23-27; Ex. 3 to Potter Decl.

11.     The Term Sheet outlined 13 "Conditions Precedent to Closing" that required satisfaction before any closing or funding of potential financing, including (a) the negotiation, execution, and delivery of definitive documentation for the facility, and (b) all approvals necessary to execute and deliver definitive documentation. Ex. 3.

12.     REV Energy would make the ultimate determination whether it would approve potential terms and conditions offered by Great Rock. Potter Decl., ¶ 20; Ex. 4 (Great Rock Depo., *e.g.*, 90:20-91:5).

13.     On January 18, 2022, Great Rock emailed "changes to the terms of the facility as approved by [Great Rock's] investment committee" and outlined terms and pre-conditions to closing. Ex. 5 to Potter Decl. On January 20, 2022, Great Rock again revised its offered terms and conditions, including reducing the letter of credit amount, adjusting the term and delayed draw term loans, and imposing conditions on their use, including the condition, among others, that "to make this work, we will require that the DDTL be used to purchase new equipment, which great Rock will have a 1st lien on…"), and noting, "Please let us know how your committee receives your presentation.  We look forward to working together to get this deal over the finish line."  *Id.* Great Rock did

not state in those communications that funding was then "made available" to REV

Energy or that REV Energy could now draw on those amounts. Ex. 5; Potter Decl. ¶ 51.

14.    Great Rock did not make a commitment to REV Energy by sending the

January 2022. *See, e.g.*, Ex. 4 to Potter Decl., Great Rock Depo., at 25:21-26:8, 69:9-

13 (approval by the Great Rock investment committee was ***not*** a commitment); 73:1-

75:1 (even a month later, in February 2022, Great Rock had not committed to loan to

REV Energy, and that Great Rock does not provide commitments until final closing,

including executing final deal documentation); Potter Decl., ¶ 35 (citing David Tolson

testimony at Ex. 9 to Potter Decl.). Great Rock testified that multiple significant steps

and Conditions Precedent to Closing were not met, and would have still needed to be

accomplished in the transaction before funding was available or a closing occurred,

including completion of legal review, and negotiation and execution of final

documentation. Ex. 4, at 30:7-34:11 (discussing each of the 13 Conditions Precedent

that were not met); 83:23-84:10 (discussing ancillary and critical legal documents not

prepared; 86:1-6 (that loan and security agreement, and financial covenants had not

"yet been negotiated between the parties"). Great Rock never allocated funds to REV

Energy. *Id.* at 68:22-69:6 (no "funding or escrowing or funds or allocation of funds").

15.    Great Rock testified that all of the Preconditions to Closing in the Term

Sheet would need to have been satisfied before REV Energy would receive any funding

from Great Rock, and before any commitment occurred, which occurs at the final

closing.  Ex. 4 to Potter Decl., at 106:18-25, 122:15-22; *see also* 25:21-26:8, 69:9-13.

16.    REV Energy did not approve Great Rock's January 18 or 20, 2022 terms

and conditions, which was relayed to Great Rock. Potter Decl., ¶ 32. The potential

financing transaction fell through and did not proceed, and there was not a closing. Potter Decl. ¶¶ 32, 40.

17.    Not all Conditions Precedent to Closing in the Term Sheet were satisfied, including, among others, that REV Energy did not provide "all consents and approvals" necessary to execute definitive documentation, which was not prepared or signed. Potter Decl. ¶ 27, 28, 33, 34; Ex. 4, at 25:21-26:8, 30:7-34:11; 69:9-13; 73:10-74:7. RWT acknowledged it had not seen loan documents, a draft note, a loan agreement, UCC financing or lien documents, or a draft letter of credit in connection with the potential transaction, and was not aware of the facility loan documents being signed. Ex. 8 to Potter Decl., at 113:25-115:15; 126:9-142:4.

18.    REV Energy never received any funding, or any "gross funding amount" under Section 3(a), from Great Rock. Potter Decl. ¶¶ 33, 39.

19.    Great Rock never transferred any funds or monies to REV Energy, which RWT acknowledges.  Potter Decl., 33; Ex. 8, RWT Depo, at 130:13-14.

20.    Great Rock did not receive a "Closing Fee," as defined by the Term Sheet, from the potential transaction.  Potter Decl. ¶ 40 (citing testimony from Great Rock).

21.    On April 19, 2022, REV Energy sent notice of termination of the Advisory Agreement.  Potter Decl., ¶ 41. Mr. Potter offered to pay RWT for its out of pocket expenses incurred in the transaction, but RWT rejected that offer.  *Id.* ¶ 38.

22.    RWT sent an invoice demanding payment of $330,000 for "Capital Advisory Services related to Corporate Equipment Financing."  *Id.* ¶ 42; Ex. 10.

23.    Great Rock used part of REV Energy's $75,000 diligence deposit to obtain from an asset appraisal company, Range Valuation Services, a valuation of REV

Energy's assets, in November 2021 (the "November 2021 Valuation").  Potter Decl., ¶¶

43-48. Mr. Potter requested permission from Great Rock to use of the November 2021

Valuation with other lenders, which Great Rock did not grant. *Id.* REV Energy paid for a

separate valuation (the "2022 Range Valuation") which it used with potential lenders,

not the November 2021 Valuation. *Id.*; Ex. 12, Robert Callaway Depo, at 56:16-64:20.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a). A dispute over a material fact is "genuine" if a

rational trier of fact could find in favor of the nonmoving party on the evidence

presented.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party

seeking summary judgment has an initial burden to show that there is an absence of

evidence to support the non-moving party's case.  *Kannady v. City of Kiowa*, 590 F.3d

1161, 1168-69 (10th Cir. 2010). The movant need "only point to an absence of evidence

to support the non-movant's claim." *Id.* at 1169. Upon meeting that burden, the non-

moving party must identify specific facts that show the existence of a genuine issue of

material fact, and may not rest upon mere conjecture, allegations, denials, or argument.

*Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 834 (10th Cir. 1986).

## ARGUMENT

**I.    REV Energy is Entitled to Judgment as a Matter of Law on Plaintiff's Breach
of Contract Claim.**

It is undisputed that REV Energy never received a "gross funding amount" of a

potential financing facility from Great Rock.  REV Energy did not agree with offered

terms and conditions; the transaction never closed; Great Rock never lent or transferred
monies; and REV Energy never received any monies.  *See* SOUF, ¶¶ 13-19. The
Parties' dispute regarding whether the "Success Fee" defined Section 3(a) of the
Advisory Agreement is thus based on whether, as RWT argues, the funds were "made
available" to REV Energy as of January 2022 when Great Rock's internal committee
approved and offered certain terms and conditions, and whether that should require
REV Energy to pay the Success Fee to RWT. For multiple reasons, the answer to that
question is an unqualified ***"NO"***:  (1) the unambiguous language of the Advisory
Agreement establishes that its "made available" language does not obligate payment of
the Success Fee (but rather, it is the receipt of gross funding that does, which never
occurred), and (2) factually, the funding for the potential financing was never "made
available" to REV Energy in January 2022 or at any other point.

> **a.    The Plain Meaning, and Unambiguous Interpretation, of the Success
> Fee Provision Demonstrates that REV Energy Was Not Obligated to
> Pay RWT the Success Fee.**

Under Colorado law, the purpose of contract interpretation is to ascertain the
intent of the parties by ensuring that contracts are construed "consistently with the well-
established principles of interpretation." *Stroh Ranch Dev., LLC v. Cherry Creek S.
Metro. Dist. No. 2*, 935 F. Supp. 2d 1052,1059 (D. Colo. 2013) (citation omitted). Courts
examine the contractual "terms and attempt to determine the parties' intent" therein.  *Id.*
When construing a contract, courts must not "view clauses or phrases in isolation." *Id.* at
1060. This principle guards against a reading of the contract that would "yield an absurd
result" -- and run inconsistent with the purpose of the contract. *Id.* (citing *Atmel Corp. v.
Vitesse Semiconductor Corp.*, 30 P.3d 789, 793 (Colo. App. 2001)). Courts must

examine the contract as a whole and attempt to determine the intent by reference to *all* of the contract's terms and provisions. *Id.* When a contractual term "unambiguously resolves the parties' dispute, the interpreting court's task is over" because "in the absence of an ambiguity a written contract cannot be varied by extrinsic evidence." *Id.* at 1060. In determining whether an ambiguity exists, courts may look to the meaning of words with "reference to all contractual provisions and the nature of the transaction which forms the contract's subject matter." *Id.* (citation omitted).

Here, the express language of Section 3(a) unambiguously demonstrates that the "Success Fee" is due to RWT only upon REV Energy "receiving" a "gross funding amount" from a lender. The plain and ordinary meaning of those terms, and a straightforward reading of them, support that interpretation.

<u>First</u>, the plain and ordinary reading of "success fee" must ascribe meaning to the term "success," meaning that there is ***success*** in the contemplated transaction. Success in this context means RWT successfully helping REV Energy achieve its goal of receiving satisfactory loan monies from a lender, which never occurred.  SOUF, ¶¶ 13-19. That is consistent with the meaning and understanding of "success fee" in the industry. *See, e.g.*, *"Success Fee"* article and meaning from Corporate Finance Institute[2] (defining "Success Fee" as a "commission paid to an advisor for successfully completing a transaction," stating "The fee is contingent on successfully helping the client achieve their goal, and thus aligns the interests of the client and the advisor" and noting its benefit/risk of the "potential savings, or cost expenditure efficiency, since there

---

[2] *Success Fee, How the Success Fee Structure Works in Banking*, Corporate Finance Institute, https://corporatefinanceinstitute.com/resources/valuation/success-fee/.

is no fee paid if there is no successful outcome"). As is known in the industry, there is risk involved to a broker or agent like RWT, in that it may not receive a success fee commission if there is not a successful closing or funding of the potential financing.[3] RWT proposed, and agreed to, that risk in the Advisory Agreement. Moreover, it is commonplace in the financial investments/lending transactions industry that the success fee is typically paid in disbursement of funds at closing, i.e., the time of "success."[4]

*Second*, RWT defined the "Success Fee" in Section 3(a) of its Advisory Agreement as one calculated as "2% of the gross funding amount" received by REV Energy. Ex. 2 to Potter Decl., at 3(a). By its own terms, the fee could not be calculated until there was a "gross funding amount" that was actually *received* by REV Energy. *Id*. That is the only way to ascribe meaning to all of the words in the first sentence of Section 3(a).  What RWT did in sending its invoice for $330,000, and bringing this lawsuit, is to calculate 2% of a *potential* funding amount of $16.5 million, mid-stream during the potential funding transaction in January 2022, which wholly ignores that the Parties did not move forward with the potential funding or reach agreement on its terms and conditions underlying it. Ex. 4 to Potter Decl., at 83:23-84:10 (Great Rock testimony regarding the "host of other diligence and legal completion items that needed to be completed to be able – for all parties *to come to agreement* and close the transaction"). RWT also ignores that the funding amount upon which RWT calculated a 2%

---

[3] *See, e.g.*, "*Success Fee,*" Wall Street Oasis, at www.wallstreetoasis.com (defining a "Success fee" as a "contingent agreement known as a 'Success Charge' specifies that a fee will be paid if the event's successful outcome. … There is no obligation to pay the money if the outcome is negative… this fee structure is typical in the industry.").
[4] *See, e.g.*, "Understanding Transaction Advisory Fees," Mercer Capital, at https://mercercapital.com/articles/understanding-transaction-advisory-fees/

commission could change or modify after January 2022, prior to any closing or receipt

of a "gross funding amount." *See, e.g.*, Ex. 4, at 16:15-23 (Great Rock testifying that

terms of a transaction can change up until closing). In short, there was never a "gross

funding amount" required by Section 3(a), let alone REV Energy receiving that amount

as required by Section 3(a). SOUF, ¶¶ 13-19. RWT's interpretation and its actions are

inconsistent with the ordinary meaning of Section 3(a).

     *Third*, RWT's interpretation of Section 3(a) to require payment of the Success

Fee when funds were "made available" is not only wrong, but it would result in an

inconsistent interpretation of the first and second sentences of Section 3(a). The first

discusses the conditions for when the payment may be due; the second adds on a

timing mechanism for when the payment is to be transmitted to RWT, stating "The funds

shall be electronically transmitted to RWT at the time at which funds are received and/or

made available to REV Energy from qualified lender(s)."  Ascribing meaning to all of that

sentence dictates that its terms relate to timing of when the Success Fee is to be

transmitted from REV Energy to RWT, not that it is a standalone sentence regarding

whether a Success Fee is due in the first place (that is the first sentence). As such,

RWT's interpretation that the "made available" phrase in the second sentence should

obligate REV Energy's payment of the Success Fee misses the mark. If a Success Fee

becomes due (*i.e.,* as set forth in the first sentence upon receipt of gross funding

amount), then the second sentence dictates when the fee is to be transferred. That is

the only way to give meaning to both sentences and to read them consistently.  *See,*

*e.g.*, Ex. 9, Tolson Depo., at 49:16-20, 50:17-22 ("My opinion is that made available is

specifically referencing a debt instrument that is available at the time all documents

have been executed by all parties. That is when it is made available. … if [debt] comes in a form that is a delayed draw note, or a line of credit or such, when it is made available is at execution of the definitive documentation, the line is set up, and the borrower has the ability to actually draw of it. That's what made available means in the investment banking world."). A straightforward reading of the "made available" language reflects that it relates to the timing mechanism for when the Success Fee is to be transferred from REV Energy to RWT, if due in the first place, at the time of actually closing or consummating the transaction and receiving funding and/or having the funds actually available to the borrower to draw upon or use.[5] Both require approvals, events, and conditions to be satisfied that indisputably did not occur here.

    _Fourth_, RWT's interpretation of Section 3(a) that the Success Fee is due simply upon "made available," which it interprets to mean upon the lender's internal approval of certain terms and conditions, would wholly read out the first sentence's language regarding the "gross funding amount" that REV Energy "receives."  An ordinary, plain interpretation of "receives" and "made available" recognizes that these are different terms with different meanings.  As such, to interpret Section 3(a) the way RWT suggests, that the fee is due when the funding is "available" would entirely obviate and eliminate the requirements that REV Energy actual "receive," and which would result in and inconsistent and incompatible meaning of Section 3(a). As it argues, RWT's interpretation would mean that REV Energy need only receive an email that the lender's

---

[5] Funds are not simply "available" to "draw upon" when there are no loan documents in place.  As RWT acknowledged in deposition, RWT is not aware of "any lender anywhere on the planet that would loan millions of dollars to a borrower without first having the borrower sign a note."  Ex. 8, RWT Depo., at 117:14-19.

committee had approved terms and conditions to offer to REV Energy to trigger the

Success Fee payment obligation. That is not what Section 3(a) says, and it would strain

credulity to view REV Energy's receipt of potential terms in an email from the potential

lender, as to which the Parties subsequently did not move forward, as having "received"

a "gross funding amount."  And it would result in an absurd outcome, where to get a

"success fee," a broker could simply point to a time prior to a successful closing as the

time when funds were "made available," even if factually, the borrower had not yet

approved the potential terms for it, diligence was not complete, transaction documents

were not negotiated or signed, and multiple preconditions to closing were not met (*i.e.,*

sending an email saying "here are your terms" so now you owe us a success fee). That

would turn the banking/lending industry on its head.

 The only reasonable way for "made available" to make sense in this context is

upon actual funding of loan monies from the lender to the borrower, not simply emailing

potential terms for a potential financing about such funding which ultimately the Parties

may not pursue.  At a minimum, actual funding is the last step in the process following

multiple steps or requirements, including the borrower agreeing to the funding and the

related loan terms, and definitive transaction documents negotiated and fully signed

(*i.e.,* before any lender would release funds, knowing where, for example it should send

the funds, such as identification of bank accounts from which the money would come or

into which they would be deposited).  *See* Ex. 4, at 116:23-25 (no bank account or

payment documents executed). That is why formal documents are critical -- they reflect

a full and final agreement, and contain important information for both sides to track the

monies and the terms relating to the lending and repayment of such monies.  As such,

14

the only reasonable interpretation is that receipt of gross funding required by Section

3(a) is upon the final consummation and closing of the actual loan financing, when the

funding is transferred from the lender to the borrower and/or the lender makes a line of

credit or draw facility actually "available" to be drawn upon by the borrower after the

execution of all final transaction documents regarding it.  And that is precisely what

Great Rock testified to in this case -- that it is not until the transaction is finalized and

closed that until Great Rock commits to the loan and funding.  SOUF ¶ 14.

> **b.    The Success Fee Language of Section 3(a) is Consistent with
> Documents and Testimony Reflecting the Parties' Intent to Pay a
> Success Fee Only Upon Successful Closing and Receipt of Funding,
> and Not at Some Earlier Point.**

A straightforward reading of the Success Fee language in Section 3(a) of the

Advisory Agreement demonstrates that unambiguously did not require payment of the

fee where no gross funding amount was ever received by REV Energy as a result of a

successfully closed transaction. That is consistent with evidence regarding the parties'

intent in negotiating RWT's compensation, which was to occur only upon REV Energy

actually receiving loan monies from a successful closing. *See, e.g.*, *Auge v. Stryker*

*Corp.*, 2021 WL 3423935, at *4 (D.N.M. Aug. 5, 2021) ("By its very nature, the parol

evidence rule only applies to curtail the admission of antecedent and contemporaneous

evidence that varies or contradicts a subsequent written contract," noting the "more

expansive view" of parol evidence which allows the "liberal admission of antecedent and

contemporaneous evidence to ascertain the truth of the parties' intent.").

For example, when negotiating how RWT would be compensated, RWT's Mr.

Ardell wrote that RWT would need "a 2% success fee ***on funding of the transaction***."

SOUF ¶ 3. Mr. Ardell did not write that RWT would need a success fee upon the

lender's internal committee approving and offering certain terms to REV Energy, or

even that it would need a success fee when funding was "made available."  Rather, he

wrote "on funding of the transaction."  *Id.*  REV Energy knew that was the case, and Mr.

Potter made it clear to RWT that REV Energy would not pay unless there was a closed

transaction, and REV received funds.  SOUF ¶ 4.  Mr. Potter demanded that REV

Energy receive "the assurance that no fees will be charged to REV ***until funding of a***

***deal is received***."  *Id.* (emphasis added). Mr. Ardell agreed, responding that RWT

would prepare an agreement for signing, and then did so.  SOUF ¶ 5. Mr. Ardell never

responded that RWT would not provide the requested assurance, nor did he ever say

that RWT would require a success fee payment at the point when the lender's internally

approved terms. *Id.* Mr. Ardell did not write that it would require a success fee at the

point when the funds were "made available," or that those funds would be "made

available" prior to diligence being completed, REV Energy providing its approvals, or

final transaction documents being negotiated, drafted, or signed.  *Id.*  As such, RWT's

after-the-fact attempt to rely on the term "made available" in the second sentence of

Section 3(a) is inconsistent with Mr. Ardell's own contemporaneous words that RWT

would "need a 2% success fee *on funding of the transaction*" and REV Energy's

express demand for assurances that it would not pay a success fee until there was

success, upon receipt of funding.

It also would defy common sense to say that Great Rock's internal approval of

terms, as expressed in Great Rock's January 18, 2022 email, was "funding" or "receipt

of funding" of the transaction, where, among other things, the funding was not finalized

or transferred at that time, and significant steps in the process remained to take place. SOUF ¶¶ 13-19; Ex. 4, Great Rock Depo., at 73:10-74:7 (noting that even a month later, as of February 10, 2022, Great Rock still had not issued a "commitment" for closing the transaction with REV Energy, and that "we don't issue commitments until we are completely done and ready to fund and all legal documents are done … Our approval is always conditioned on all of the conditions precedent, most importantly including full, executed legal documentation in a form satisfactory to all parties, including Great Rock. And we – we did not have that.").

Additionally, the very January 18 and 20, 2022 Great Rock emails upon which RWT relies to say that funds were then "made available" to REV Energy contradicts RWT's interpretation. Great Rock outlined "changes to the terms of the facility as approved by our investment committee," but still noted various pre-conditions to closing including REV signing a contract with its customer and Great Rock's ability to block payments, and that Great Rock was continuing to discuss further adjustments to the line of credit amount. *See* SOUF ¶ 13; Ex. 5 to Potter Decl. And Great Rock acknowledged that REV Energy still needed to approve terms. *Id.* Great Rock testified that these were ***not*** the only remaining pre-conditions to closing, and that all of the 13 pre-conditions to closing reflected in the Term Sheet still needed to be satisfied, including REV Energy's approvals and definitive documentation. SOUF ¶ 17. It is undisputed that these things never happened, and that REV Energy did not approve these terms. SOUF ¶¶ 15-19. Great Rock's own words acknowledge the potential financing required further review and approvals (which never came). Nowhere does Great Rock or RWT say in the

January 2022 emails that "the funding is now 'made available' to you" or words to that effect.  *See* SOUF ¶¶ 13-14; Ex. 5 to Potter Decl.

For all of these reasons, it is undisputed that the only actual prong of the Success Fee provision -- REV Energy receiving a gross funding amount -- never occurred, and as such, REV is entitled to judgment as a matter of law that it did not need to make the payment and thus did not breach the Advisory Agreement by not doing so.  It is also undisputed that the contemplated funding was never actually "made available" at any point, let alone the January 2022 date where RWT says it was. Where there is no disputed factual basis to find that REV owed the payment or breached the contract, summary judgment is appropriate.

<blockquote>

c.    **There is No Genuine Dispute of Fact for RWT's Allegation that REV Energy Breached by Allegedly Using a November 2021 Valuation.**
</blockquote>

RWT alleges that REV Energy breached the Advisory Agreement by "seeking to undermine the exclusivity of Great Rock's use of the [November 2021] Appraisal," alleging, without factual basis, that REV Energy used the November 2021 Appraisal with other potential lenders. RWT Complaint, at ¶¶ 47-50. But other than conjecture and argument, RWT has not, and cannot, produce any evidence to prove that REV Energy breached any obligation in connection with the November 2021 Valuation.

The undisputed facts demonstrate that REV Energy, through its own diligence deposit, paid the value of the November 2021 Valuation of its assets in connection with the potential Great Rock loan, which valuation was prepared for the exclusive use of Great Rock in connection with the potential financing. SOUF ¶ 23. When REV Energy requested permission from Great Rock to use the November 2021 Valuation with other

lenders, after the potential financing with Great Rock fell through, and did not receive
that permission, REV Energy **did not** use the November 2021 Valuation, but spent the
effort and money to commission the 2022 Range Valuation, which it used with other
lenders. SOUF ¶ 23; *see also* Ex. 12, Callaway Depo., at 56:16-64:20. There is no
evidence that REV Energy used the November 2021 Valuation with other lenders, as
suggested, or that its conduct regarding the valuation breached the Advisory Agreement
in any manner. SOUF ¶ 23. Plaintiff's claim for breach of contract based on REV
Energy's alleged use of the November 2021 Valuation should fail as a matter of law.

## II.    REV Energy is Entitled to Judgment as a Matter of Law on Plaintiff's Equitable Quasi-Contract Claims

For the reasons set forth above, Plaintiffs' second claim for "Quantum
Meruit/Unjust Enrichment" and its third claim for "promissory estoppel" fail as a matter of
law.  This is because they are (1) equitable remedies which are inapplicable, or barred,
given the existence of the Advisory Agreement expressly addressing the same subject
matter of REV Energy's alleged obligation to pay the Success Fee,[6] and (2) there is no
genuine dispute of material fact regarding either of those claims.

As set forth in *Levin v. Five Corners Strategies, LLC*, 541 F. Supp. 3d 1262,
1270–71 (D. Colo. 2021), a party "cannot recover on a theory of detrimental reliance,
***promissory estoppel, or unjust enrichment*** 'where there is an express contract

---

[6] "Quantum meruit is an equitable theory of recovery that arises out of the need to
avoid unjust enrichment to a party in the absence of an actual agreement to pay for
services rendered." *Tegu v. Vestal Design Atelier LLC*, 407 F. Supp. 3d 1171, 1181 (D.
Colo. 2019) (citation omitted). "[C]ourts will refuse quantum meruit recovery when
expressly contrary to the provisions of the written contract between the parties."  *Id.*
(citation omitted).

addressing the subject of the alleged obligation to pay.'" (citing *Pulte Home Corp., Inc.*

*v. Countryside Cmty. Ass'n, Inc.*, 382 P.3d 821, 833 (Colo. 2016) (emphasis added)).

RWT's claims rest on its allegations that REV Energy promised to pay the Success Fee

and failed to do so, and that RWT relied on that to its detriment. But RWT does not, and

indeed cannot dispute, that there exists a valid contract, the Advisory Agreement,

covering the same subject matter underlying its breach of contract claim as that

underlying its equitable claims. And as set forth above, there is no genuine dispute of

material fact that would allow these claims to survive summary judgment. As such,

Colorado law dictates that REV Energy is thus entitled to summary judgment on these

claims. *See id.* at 1271; *see also Member Servs. Life Ins. Co. v. Am. Nat. Bank & Tr.*

*Co. of Sapulpa*, 130 F.3d 950, 957 (10th Cir. 1997) ("[Q]uasi-contractual remedies ...

are not to be created when an enforceable express contract regulates the relations of

the parties with respect to the disputed issue").

## **CONCLUSION**

WHEREFORE, for all of the foregoing reasons, Defendant REV Energy Services,

LLC respectfully requests that the Court grant this Motion and enter summary judgment

in REV Energy's favor and against Plaintiff RWT dismissing each of Plaintiff's claims,

and award REV Energy all further relief that the Court deems just and proper.

Respectfully submitted this 21st day of August 2023.

SHERMAN & HOWARD L.L.C.

*s/ Nicholas M. DeWeese*
Peter G. Koclanes
Nicholas M. DeWeese
675 Fifteenth Street, Suite 2300
Denver, Colorado 80202
Telephone: (303) 297-2900
Email:  pkoclanes@shermanhoward.com
          ndeweese@shermanhoward.com

*ATTORNEYS FOR DEFENDANT*

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2023, a true and correct copy of the foregoing
**DEFENDANT REV ENERGY SERVICES, LLC'S MOTION FOR SUMMARY
JUDGMENT** was electronically filed with the Clerk of the Court using the CM/ECF
system, which will send notification of such filing to all counsel of record:

James Billings-Kang, Esq.
Cozen O'Connor
1200 19th Street N.W., Suite 300
Washington, DC  20036
Email: jbillings-kang@cozen.com

Christopher Clemenson, Esq.
Cozen O'Connor
707 17th Street, Suite 3100
Denver, CO 80202
Email:  cclemenson@cozen.com

*Donna Fouts*
Donna L. Fouts, Practice Assistant